898 F.2d 1088
 INGALLS SHIPBUILDING, INC., Petitioner,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, U.S.
DEPARTMENT OF LABOR, Respondent,
and
Aaron C. Fairley, Respondent.
INGALLS SHIPBUILDING, INC., Petitioner,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, U.S.
DEPARTMENT OF LABOR, Respondent,
and
John A. Ryan, Respondent.
INGALLS SHIPBUILDING, INC., Petitioner,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, U.S.
DEPARTMENT OF LABOR, Respondent,
and
Ervin J. Gulley, Respondent.
 Nos. 89-4459, 89-4468 and 89-4469.
 United States Court of Appeals,
Fifth Circuit.
 April 26, 1990.
Rehearing and Rehearing En Banc Denied June 1, 1990.
 
 Karl Wiesenburg, Pascagoula, Miss., Richard P. Salloum, Traci M. Castille, Franke, Rainey & Salloum, Gulfport, Miss., William F. Jordan, Pascagoula, Miss., for Ingalls Shipbuilding.
 Lowry M. Lomax, Rebecca J. Ainsworth, John F. Dillon, Pascagoula, Miss., for Fairley.
 Linda Meekins, Clerk, Benefits Review Bd., U.S. Dept. of Labor, Washington, D.C., for other interested parties in Nos. 89-4459 and 89-4469.
 Janet R. Dunlop, James Michael O'Neill, Sol., Donald S. Shire, Associate Sol. of Labor, Office of U.S. Dept. of Labor, NDOL, Washington, D.C., for Director.
 Lowry M. Lomax, John F. Dillon, Rebecca J. Ainsworth, Pascagoula, Miss., Linda Meekins, Clerk, Benefits Review Bd., Dept. of Labor, Washington, D.C., for Ervin J. Gulley in No. 89-4468.
 On Petition for Review of Orders of the Benefits Review Board.
 Before GEE, GARZA and DAVIS, Circuit Judges.
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 Ingalls Shipbuilding, Inc. (Ingalls), the employer, appeals the Benefits Review Board's (the Board) compensation award under the Longshore and Harbor Workers' Compensation Act (LHWCA or the Act) and the Board's award of attorneys' fees and penalties. We affirm in part and reverse in part.
 
 I. Facts
 
 2
 Three retired Ingalls employees, Aaron C. Fairley, John A. Ryan, and Ervin J. Gulley, filed compensation claims against Ingalls for binaural hearing loss suffered as a result of exposure to noise at work. Three Administrative Law Judges (ALJ) heard the workers' respective claims and assessed compensation values. Ingalls then appealed the awards to the Board which consolidated the appeals for oral argument but severed them for determination.
 
 
 3
 The Board affirmed the ALJ award of compensation pursuant to 33 U.S.C. Sec. 908(c)(13) of the Act which covers compensation for permanent partial disability due to hearing loss. The Board assessed a ten percent penalty against Ingalls as to each claimant because Ingalls had not filed proper and timely controversions of the claims according to 33 U.S.C. Sec. 914(e). Finally, the Board affirmed the ALJ award of attorneys' fees to the claimants under 33 U.S.C. Sec. 928(b) because the claimants had utilized the services of an attorney to receive a greater compensation award.
 
 
 4
 Ingalls filed a timely appeal of the computation of benefits, the assessment of penalties, and the award of attorneys' fees.
 
 II. Compensation for Hearing Loss
 
 5
 A. The Applicability of the LHWCA Retiree Provisions
 
 1. The statutory scheme
 
 6
 The primary point of contention on appeal is the applicability of four 1984 amendments to the LHWCA: the addition of 33 U.S.C. Secs. 910(d)(2), 910(i), 908(c)(23) and portions of Sec. 902(10).[1] Before the 1984 amendments, a claimant had to prove loss of wage-earning capacity, which precluded voluntary retirees who discovered their disability following retirement from obtaining compensation. See, e.g., Aduddell v. Owens-Corning Fiberglass, 16 BRBS 131 (1984). Congress added the above provisions to allow voluntarily retirees to recover even if they could not prove loss of earning capacity.
 
 2. The Board's opinion
 
 7
 In its opinion, the Board explained that Sec. 908(c)(13)[2] specifically covers hearing loss, while Sec. 908(c)(23) is a more general provision applicable only to retirees. The Board read Sec. 908(c)(13) to supercede Sec. 908(c)(23) because it concluded that Congress intended Sec. 908(c)(23) to apply only to occupational diseases not specifically compensated elsewhere. The primary differences in the compensation under the two statutes is that under Sec. 908(c)(23), claimants receive a weekly rather than a lump sum payment and the percentage of disability is determined as a percentage of disability to the "whole man"[3] rather than as a percentage of hearing loss.
 
 
 8
 Both Ingalls and the Director of the Office of Workers' Compensation Programs (the Director) agree that the Board's reasoning is flawed. On its face, Sec. 908(c)(23) applies to retirees "notwithstanding [Sec. 908(c) ] paragraphs (1) through (22)." We agree that the Board erred in simply ignoring that language. Because the Board's reasoning is contrary to the statute's plain language, we agree that its reasoning cannot support its awards. We next consider Ingalls' arguments and the alternative grounds urged by the Director and the claimants to support the Board's conclusion.
 
 3. Ingalls' argument
 
 9
 Ingalls contends that, because the claimants were retired, their compensation should have been figured under Sec. 908(c)(23), which covers all retired employees; Sec. 908(c)(13), has no application to retirees and only covers hearing loss suffered by active employees. All parties agree that hearing loss is an occupational disease. Ingalls argues that, because: (1) Sec. 908(c)(23) expressly applies when wages are determined under Sec. 910(d)(2), and (2) Sec. 910(d)(2) governs the computation of the wage rate of all retired employees who suffer death or disability due to an occupational disease, it follows that Sec. 908(c)(23) should apply in all cases of occupational disease suffered by voluntary retirees. In other words, Sec. 908(c)(23) adopts the computation method of Sec. 910(d)(2) providing solely for voluntary retirees who suffer from employment-related occupational diseases. With the exception of hearing loss cases, the Director agrees with Ingalls that Sec. 908(c)(23), by adopting the computation method of Sec. 910(d)(2) is the statutory authority for compensating voluntary retirees suffering from occupational diseases.
 
 4. The Director's argument
 
 10
 The Director argues that Sec. 908(c)(23) and Sec. 910(d)(2) were added as part of the 1984 amendments to the Act only to give compensation to retirees who suffered from delayed-disability occupational disease. That is, retirees who suffer from occupational diseases, such as asbestosis, that may not create disability until after retirement, are entitled to claim benefits under Sec. 908(c)(23); however, an employee with hearing loss which, unknown to the employee, has developed into a disabling condition at the time the employee leaves the workplace is covered by Sec. 908(c)(13). In other words, the Director contends that employees with hearing loss that has fully developed and will not increase after they retire, should be compensated under Sec. 908(c)(13) rather than Sec. 908(c)(23), the retiree section.
 
 
 11
 The core of the Director's argument is his interpretation of Sec. 910(i). Section 910(d)(2) which establishes the method to compute the wage rate for retirees incorporates the "time of injury" definition of Sec. 910(i) into the retiree compensation scheme. The Director contends that Sec. 910(d)(2) only applies to claims for compensation for "disability due to an occupational disease which does not immediately result in death or disability...." Sec. 910(i). Thus, the director argues that Sec. 910(d)(2), describing the method of computing the retiree's average weekly wage, only applies if the disability does not immediately develop because the only possible purpose of the language in Sec. 910(i) referring to an "occupational disease which does not immediately result in death or disability" is to distinguish between the compensation scheme for diseases which do not lead to disabilities until after retirement and for disabling occupational diseases which are fully developed at the time exposure to the harm ceases. The Director contends that because of this distinction: (1) the time of injury is the time of last exposure to the work environment that caused the deafness; (2) the wage rate is computed under Sec. 910(a)-(d)(1); and (3) the degree of impairment is computed under Sec. 908(c)(13), just as if the claim had been filed prior to retirement and without reference to the 1984 retiree amendments.
 
 
 12
 The director relies on the legislative history of the Act to support his argument that hearing loss cases are outside the scope of the Sec. 908(c)(23) scheme. The director points out that the amendment made "express provision for the payment of benefits to retirees who become disabled during retirement as a result of an occupational disease." 130 Cong.Rec. 26300 (1984) (emphasis added). While we usually do not consider the legislative history of a statute which is clear and unambiguous on its face,[4] the Director argues that the legislative history is not necessary to interpret the statutory scheme for retiree compensation, but, rather, to determine whether it has any applicability to cases involving retirees with hearing loss. Because the language of Sec. 910(i) may raise some doubt as to the applicability of the statute, we will address the arguable ambiguity in Sec. 910(i).
 
 5. Discussion
 
 13
 We note that the Board has refused to adopt the Director's interpretation of Sec. 910(i). See Machado v. General Dynamics Corporation, 22 BRBS 176 (1989). We review its analysis in depth here because it frames the issues and we find its reasoning persuasive.
 
 
 14
 In Machado the Board first construed the relevant language in Sec. 910(i) as being descriptive of all occupational diseases and noted that hearing loss had always been treated in the same manner as other occupational diseases. The Director argues that Sec. 910(i) itself provides a basis for the distinction that did not exist before. We agree that the determinative issue is whether Congress intended to make a distinction between hearing loss (and possibly other occupational diseases that get no worse after retirement) and other types of occupational diseases.
 
 
 15
 The Board also cited portions of the legislative history to support its conclusion that Sec. 910(i) does not distinguish between types of occupational diseases.
 
 
 16
 [T]he legislative history of the 1984 Amendments ... indicates that Congress intended for Section 10(i) to apply to hearing loss claims. In congressional debate on the conference report of the 1984 Amendments, Senator Hatch observed that in Aduddell v. Owens-Corning Fiberglass, 16 BRBS 131 (1984), and Redick v. Bethlehem Steel Corp., 16 BRBS 155 (1984), the Board denied compensation to workers who had manifested occupational diseases after permanently retiring from the work force. 130 Cong.Rec. [26300] (1984). The Senator stated that those interpretations of the Act "did not represent equitable policy" and noted that the Amendments made "express provision for the payment of benefits to retirees who become disabled during retirement as a result of an occupational disease." Id. The inclusion of Redick, which involved a claim for hearing loss from a retired worker, signals congressional intent to treat hearing loss like occupational diseases involving respiratory impairments for the purpose of determining time of injury.
 
 
 17
 Id. at 179.
 
 
 18
 The director argues that, by requiring notice of injury only after the employee has an audiogram, the expanded statute of limitations provision for hearing loss cases (Sec. 908(c)(13)(D)) remedies the inequity with which Congress was concerned, obviating the need to resort to the Sec. 908(c)(23) scheme. This interpretation may be a plausible reading of the statute, but there is no indication that Congress' reference to hearing loss cases indicated a desire to establish a wholly separate occupational disease scheme for retirees with hearing loss. To the contrary, Congress was addressing the problem of compensating retirees for occupational diseases in general and made no distinction among types of diseases or disabilities. In the statement on which the Board relied, Senator Hatch referred to an asbestosis case and a hearing loss case as examples of the type of problem the amendment was to remedy; he did not comment on the different occupational diseases involved and his statement came under the heading "RETIREES." The excerpts from the Congressional Record indicate that retirees with hearing losses should be treated the same as all other retirees.
 
 
 19
 Finally, the Board refused to adopt the Director's position because doing so would resurrect the "date of last exposure" method for determining the time of injury. Another court rejected this scheme in Todd Shipyards Corp. v. Black, 717 F.2d 1280 (9th Cir.1983), cert. denied, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). See also Castorina v. Lykes Brothers Steamship Co., Inc., 758 F.2d 1025, 1031 (5th Cir.), cert. denied, 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985). Under this method, the wage on which compensation is based is that which the workers received on the date they were last exposed to the hazard because the injury is deemed to have occurred at that point. As applied here, the claimants' injury would be considered to have occurred on their last day of work and they would be compensated under Sec. 908(c)(13) based on their wage rate on their last day of work.
 
 
 20
 The Director argues that cases such as Black, which rejected the date of last exposure scheme, are not applicable here. The claimant in Black suffered from asbestosis, which was latent until some time after he left the work environment where he was exposed to the asbestos. In other words, the worker had suffered no compensable loss until he had left the workplace. In hearing loss cases, the full extent of the claimants' injuries is set on the day they leave the workplace; there is no progression of occupational deafness once the worker leaves his noisy workplace so the date of last exposure and the date of compensable loss coincide.
 
 
 21
 We agree that differences may exist between the progression of asbestosis versus hearing loss. However, we do not find that this calls for different treatment of the two conditions. Both occupational diseases are caused by elements in the workplace and both result in permanent partial disability of which the claimant may not be aware until after retirement. The fact that hearing loss does not progress after retirement does not compel a different compensation scheme absent a showing that Congress intended one. Congress did not incorporate the date of last exposure scheme into the 1984 amendments covering occupational diseases so there is no basis for a court-created scheme here, particularly when courts have already rejected it in what we conclude are similar contexts.
 
 
 22
 While we agree that the Director's reading of Sec. 910(i) is arguable, we see no indication that Congress intended this interpretation. Rather, the legislative history indicates that Congress created a single scheme for retirees regardless of the nature of their occupational disease.
 
 
 23
 B. Exceptions to the Plain Language Interpretation
 
 
 24
 The Director and claimants also argue that following the plain language leads to such an absurd result that it should be ignored. United States v. American Trucking Associations, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1063-64, 84 L.Ed. 1345 (1940) (when the plain language is clearly inconsistent with the policy of the legislation the court may follow the purpose of the Act rather than the literal words). They contend that the weekly payment is so small that it would be clearly contrary to the intent of the LHWCA.
 
 
 25
 As Ingalls points out in its brief, a claimant who retires at age 61 and receives compensation under Sec. 908(c)(23) for his expected life of 17 years would receive a greater sum than if the worker had received a lump sum under Sec. 908(c)(13). Despite this fact, under Sec. 908(c)(23) the claimants here will receive less compensation than active employees. However, Congress was clearly free to compensate retirees at a different rate than active employees. We may not change the statutory scheme to avoid what the Commissioner argues is an inequitable result in this case.
 
 C. The Percentage of Disability
 
 26
 Finally, claimants argue that, even if Sec. 908(c)(23) is used, the relevant percentage should be the loss to hearing, and not the loss to the "whole man." Neither the ALJ nor the Board questioned the conversion of the claimants' percentage of hearing loss into a percentage of impairment of the "whole man" pursuant to the American Medical Association's guidelines if Sec. 908(c)(23) applied.
 
 
 27
 Section 902(10) states that, when a claimant comes under Sec. 910(d)(2), disability means "permanent impairment, determined ... under the guides to the evaluation of permanent impairment promulgated ... by the American Medical Association." The Secretary of Labor has construed this to mean the AMA Guides to the Evaluation of Permanent Impairment. See 20 C.F.R. Sec. 702.601(b) (1987). The Guides espouses the philosophy that impairments affect the whole person and, therefore, the disability should be expressed as a percentage of the impairment of the whole person. See American Medical Association, Guides to the Evaluation of Permanent Impairment iii (2d ed. 1984). The Guides provide a formula and table for evaluating binaural hearing impairment and then refers the reader to a table for making the conversion to impairment of the whole person. Id. at 154, 156 Table 3, 158 Table 4.
 
 
 28
 Claimants argue that the reference to the AMA standards in the statute was meant to ensure uniformity of compensation awards and the Guides is only to be used to evaluate the degree of hearing loss shown by the audiogram and the statute does not mandate conversion of the disability to impairment of the whole person. See Cutting v. Gen'l Dynamics, 21 BRBS 108, 110 (1988).
 
 
 29
 Claimants' argument is without merit. Cutting involved compensation under Sec. 908(c)(13), not under the retiree scheme. In Cutting, the Board only addressed the treatment of "awards under the [Sec. 908(c)(1)-(22) ] schedule." Id. Although the statute does not make specific reference to conversion to whole person impairment we conclude that, under the Department of Labor's interpretation of the statute, the Guides should be given full effect. Since the Guides clearly converts injuries to impairments of the whole person, that procedure should be followed here.[5]
 
 III. Penalties
 
 30
 Section 914(e) of the Act provides that employers are liable for a ten percent penalty for failure to pay a compensation award when due, unless they timely file a notice of controversion or are excused. If the employer files a notice of controversion, it must include the grounds upon which the claim is controverted. 33 U.S.C. Sec. 914(d).
 
 
 31
 Ingalls' counsel, citing unspecified conditions beyond their control, requested leave from the deputy commissioner to file later than the time prescribed, and leave was granted. Later, Ingalls did file an "answer" to the claims, which stated that "based on the information presently available" it did not controvert the claim, and "unless evidence is obtained contrary to that provided the compensability of [the] claim is accepted."
 
 
 32
 The ALJ concluded that he did not have authority to review the deputy commissioner's grant of an excuse, but found that the letter satisfied the controversion requirement of Sec. 914(e), and did not assess a penalty as to two of the claimants. The Board found that the deputy commissioner had abused his discretion in excusing the delay as Ingalls had not cited any circumstances beyond its own control for the delay, but instead had referred to delays in the Commissioner's office. The Board further found that the letters Ingalls sent did not constitute controversions of the claims, and set a penalty as to all three claimants.
 
 
 33
 Ingalls argues that granting an excused delay is a discretionary function and it was error for the Board to find otherwise. However, the Board did not find the absence of discretion, but, instead, found that the deputy commissioner's actions were an abuse of discretion. We agree with the Board. Delays in the Commissioner's office did not interfere with Ingalls' ability to file a controversion or make payments because such actions were not contingent upon proceedings in the Commissioner's office.
 
 
 34
 Ingalls' claims of detrimental reliance are without merit. Ingalls could not have detrimentally relied on the excuse; the payments were several months overdue when Ingalls first requested the extension.
 
 
 35
 Ingalls also argues that the Board should not have reversed the ALJ's finding that the answer constituted a controversion. The factual findings of the ALJ must be accepted unless inconsistent with the law or unsupported by substantial evidence in the record as a whole. Fulks v. Avondale Shipyards, Inc., 637 F.2d 1008, 1011 (5th Cir.), cert. denied, 454 U.S. 1080, 102 S.Ct. 633, 70 L.Ed.2d 613 (1981).
 
 
 36
 Section 914(d) specifically requires that the employer controvert the claim on specified grounds. Ingalls wholly failed to do that. Instead, Ingalls merely stated that, should any new evidence come to light, it might then controvert the claim. The Board held that, as a matter of law, the answer could not constitute a controversion. We agree that Ingalls did not controvert the claim as required by the statute.
 
 
 37
 Finally, Ingalls argues that retirees should not receive Sec. 914(e) penalty awards, as they do not meet the stated purposes of the section. Ingalls argues that Sec. 914(e) was meant to compensate for the inconvenience and expense of supporting oneself during a time of reduced or destroyed earning capacity. The Board correctly rejected that argument by stating that the penalty was also designed to encourage employers to " 'bear the burden of bringing any compensation disputes to the attention of the Department of Labor.' " Cox v. Army Times Publishing Co., 19 BRBS 195, 198 (1987), citing White v. Rock Creek Ginger Ale Co., 17 BRBS 75, 78 (1985).
 
 
 38
 We conclude that the Board did not err in assessing the Sec. 914(e) penalty against Ingalls.
 
 IV. Attorneys' Fees
 
 39
 The Board affirmed the ALJ's decision to grant the claimants attorneys' fees under 33 U.S.C. Sec. 928(b).[6] The Board held that the claimants' attorneys obtained a lump sum under Sec. 908(c)(13) rather than a small weekly payment under Sec. 908(c)(23), and, therefore, Ingalls should be liable for fees. The Board did not decide which method would ultimately result in a greater award, as it found that a lump sum satisfied the "greater compensation" requirement of Sec. 928(b). Because of today's holding that claimants are not entitled to a lump sum payment, we reverse the Board's grant of attorneys' fees.
 
 
 40
 Claimants argue that they should be granted attorneys' fees on other grounds. First, Ingalls originally contested claimants' right to select their own physicians, but the ALJ found that the claimants could select their own physicians at Ingalls' expense, so long as the bills were "reasonable." See Oilfield Safety and Machine Specialties, Inc. v. Harman Unlimited, Inc., 625 F.2d 1248, 1257 (5th Cir.1980). The claimants' own physicians found greater hearing loss than Ingalls' physician found. Second, claimants argue that the award of Sec. 914(e) penalties was an increased benefit. Finally, during the pendancy of the claim before the ALJ, Ingalls agreed to a compromise of the percentage of hearing impairment. The higher percentage of hearing loss resulted in greater compensation.
 
 
 41
 The Board and ALJ did not address whether attorneys' fees were due based on any theory other than the application of Sec. 908(c)(13) rather than Sec. 908(c)(23) and we will not consider it for the first time on appeal. We, therefore, remand for reconsideration of whether claimants are entitled to attorneys' fees on grounds other than those relied on by the Board.
 
 V. Conclusion
 
 42
 The Board erred in determining that claimants should be compensated under Sec. 908(c)(13). On remand, the Board shall amend the award to compensate for the claimants' hearing loss under the retiree scheme embodied in Secs. 908(c)(23), 910(d)(2), 910(i), and 902(10). Ingalls must pay penalties to claimants on the amended award under Sec. 914(e). The Board's award of attorneys' fees is vacated and we remand for reconsideration. Accordingly, the award is affirmed in part, vacated in part and remanded for further consideration consistent with this opinion.
 
 
 43
 REVERSED IN PART, AFFIRMED IN PART AND REMANDED.
 
 
 
 [1]
 Section 910(d)(2) provides:
 (2) ... with respect to any claim based on a death or disability due to an occupational disease for which the time of injury (as determined under subsection (i) of this section) occurs--
 (A) within the first year after the employee has retired, the average weekly wages shall be one fifty-second part of his average annual earnings ... or
 (B) more than one year after the employee has retired, the average weekly wage shall be deemed to be the national average weekly wage ... applicable at the time of the injury.
 Section 910(i) provides:
 For purposes of this section with respect to a claim for compensation for death or disability due to an occupational disease which does not immediately result in death or disability, the time of injury shall be deemed to be the date on which the employee or claimant becomes aware ... of the relationship between the employment, the disease, and the death or disability.
 Section 908(c)(23) provides:
 Notwithstanding paragraphs (1) through (22), with respect to a claim for permanent partial disability for which the average weekly wages are determined under Sec. 910(d)(2) of this title, the compensation shall be 66 2/3 per centum of such average weekly wages multiplied by the percentage of permanent impairment, as determined under the guides referred to in Sec. 902(10) of this title, payable during the continuance of such impairment.
 The portion of Sec. 902(10) added by the 1984 amendment is highlighted below:
 (10) "Disability" means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment; but such term shall mean permanent impairment, determined (to the extent covered thereby) under the guides to the evaluation of permanent impairment promulgated and modified from time to time by the American Medical Association, in the case of an individual whose claim is described in section 10(d)(2) of this title.
 Longshore and Harbor Workers' Compensation Act Amendments of 1984, Pub.L. No. 98-426, Secs. 2(b), 8(a), (c), 10(a), 98 Stat. 1639, 1644-45, 1647-48.
 
 
 [2]
 Section 908(c)(13) provides, in part:
 (13) Loss of hearing:
 (B) Compensation for loss of hearing in both ears, two-hundred weeks.
 
 
 [3]
 See section II.C. below
 
 
 [4]
 City of Madison, Miss. v. Bear Creek Water Ass'n, Inc., 816 F.2d 1057, 1059 (5th Cir.1987)
 
 
 [5]
 The Director does not dispute, but, rather, implicitly accepts the conversion to impairment of the whole person. As explained in the preceding section, the Director challenges the application of Sec. 908(c)(23) because it leads to such a small weekly payment. The size of the payment is significantly affected by the conversion to the whole person which the Director himself used to compute the challenged weekly payment
 
 
 [6]
 Section 928(b) provides, in pertinent part:
 If the employer or carrier pays or tenders payment of compensation ... and thereafter a controversy develops over the amount of additional compensation, if any, to which the employee may be entitled, ... the deputy commissioner or Board shall recommend in writing a disposition of the controversy.... If the employee ... thereafter utilizes the services of an attorney at law, and if the compensation thereafter awarded is greater than the amount paid or tendered by the employer or carrier, a reasonable attorney's fee based solely upon the difference between the amount awarded and the amount tendered or paid shall be awarded in addition to the amount of compensation.